UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| **DOROTHY D. GLODEK** <br> 41655 Catoctin Springs Court <br> Leesburg, VA 20176 <br><br> **Plaintiff** <br><br> v. <br><br> **CHARLES P. RICHARDSON** <br> 68 Ponte Colony Circle <br> Ponte Vedra Beach, Florida, 32082 <br><br> **PARKS FAMILY, LLC** <br> 68 Ponte Colony Circle <br> Ponte Vedra Beach, Florida, 32082 <br><br><br> **Defendants.** | Case No. |

## COMPLAINT

Dorothy D. Glodek, an individual, by and through her attorneys, files this Complaint against Charles P. Richardson, an individual, and Parks Family, LLC, a Wyoming limited liability company, and alleges as follows:

### PARTIES

1. Plaintiff Dorothy D. Glodek is a citizen of the Commonwealth of Virginia.

2. Defendant Charles P. Richardson is a citizen of the State of Florida.

3. Parks Family, LLC is a citizen of the State of Florida because its sole member, Charles P. Richardson, is a citizen of the State of Florida.

1

## JURISDICTION AND VENUE

4. Jurisdiction over this action is proper under 28 U.S.C. § 1332 as Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.

## FACTS

6. Prior to May 3, 2017, Glodek owned AMI Cardiac Monitoring, Inc., a subchapter S corporation. Effective May 3, 2017, the Board of Directors of AMI Cardiac Monitoring, Inc. converted the entity to a Maryland limited liability company, AMI Cardiac Monitoring, LLC ("AMI").

7. The conversion of AMI to an LLC was done pursuant to discussions between Glodek and Richardson regarding the creation of a joint venture between them. These discussions began in mid-November 2016 and culminated in the signing of a Contribution and Exchange Agreement ("the Agreement") effective May 12, 2017. Glodek signed the Agreement in Maryland. While Glodek and Richardson met on several occasions in Florida and North Carolina to discuss the proposed venture, the majority of their interactions were conducted by e-mail and telephone. Richardson sent dozens of e-mails to Glodek whose office was and is in Rockville, Maryland and received dozens of e-mails from Glodek that were sent from her office in Rockville, Maryland. In addition, Richardson initiated numerous telephone calls to Glodek at her Maryland office number as well as her cell phone which has a Maryland area code. Furthermore, subsequent to

2

the execution of the Agreement, Richardson continued to send to and receive e-mails from Glodek in Maryland and to place calls to and receive calls from Glodek in Maryland.

8. AMI's business was the provision of cardiac monitoring services for patients. Richardson claimed that he owned various technologies that he would contribute to the joint venture that would enhance the cardiac monitors utilized by AMI and would generate substantially greater numbers of patients and therefore greater revenue and profits.

9. Glodek and Richardson created IntelHeart International, Inc. ("IHI"), initially a Nevada corporation, on March 30, 2017 as the entity through which they would pursue this joint venture. On December 14, 2017, they converted IHI to a Delaware corporation. The Agreement provided that Glodek would sell, transfer, assign and contribute AMI to IHI in exchange for shares of stock of IHI equal to a 50% ownership interest. The IHI stock was then assigned by Glodek to D Glodek Lucketts Family LLC ("DGL"). The Agreement provided that Parks Family LLC, as the owner of numerous technologies developed by Richardson as listed on Schedule 1 of the Agreement ("the Parks Technology"), would sell, transfer, assign, and contribute the Parks Technology to Advanced BioIP, a Florida limited liability company, in exchange for shares of stock of IHI equal to a 50% ownership interest. Significantly, although the Agreement described Advanced BioIP as "wholly-owned" by IHI, Advanced BioIP was created by Glodek and Glodek is its sole member. No documents were ever created or executed to transfer ownership of Advanced BioIP to IHI. In fact, although Advanced BioIP is mentioned in the Agreement, it is not a signatory to it. Therefore, IHI received no consideration from Richardson or Parks Family in exchange for the IHI shares received by Richardson through Parks Family, rendering the Agreement null and void for lack of consideration.

3

10. Consideration for the grant to Parks Family of stock in IHI was also lacking due to the fact that Richardson and Parks Family either did not in fact own the technology that he and it purported to contribute to Advanced BioIP or the technology was worthless.

11. The Agreement provided that Parks Family was selling, assigning, transferring, conveying, delivering and contributing its entire right, title and interest in the Parks Technology set forth in Schedule 1 to the Agreement to Advanced BioIP. Schedule 1 described the Parks Technology as:

--24 or 48 hour Holter Patch Monitor for continuous beat-by-beat evaluation for heart rhythm for arrhythmia, ischemia, and heart rate variability;

--Long-term Holter Patch Monitor for continuous beat-by-beat evaluation for heart rhythm for arrhythmia, ischemia, and heart rate variability for 3 to 10 days of continuous monitoring;

--30-day cardiac event monitoring with transmission of patient-triggered and auto-triggered events over cellular data networks including event quantification for cardiac events with data analytics;

--Mobile Cardiac Telemetry monitoring with transmission of patient-triggered, auto-triggered and comprehensive burden of atrial fibrillation, bradycardia and tachycardia with data analytics from events and full-disclosure data over cellular data networks.

12. Richardson's and Parks Family's representation that he owned, through Parks Family, the technology listed on Schedule 1 was false. Neither Richardson nor Parks Family owns any of the listed technology or monitors. Therefore, Richardson's and Parks Family's contribution was worthless and the Agreement must be deemed null and void for lack of consideration.

13. Richardson and Parks Family made these misrepresentations regarding his and Parks Family's ownership of the technology listed in Schedule 1 to induce Glodek to enter into the Agreement, knowing that she was relying on the truth of the representations.

14. In addition to the misrepresentations regarding the ownership of the Parks Technology, Richardson and Parks Family also engaged in other acts of fraud to induce Glodek to enter into the Agreement. All of the Agreements entered into by Glodek, Richardson, and Parks Family in connection with their joint venture were initially drafted by an attorney who was hired by Richardson on behalf of both Glodek, himself, and Parks Family. However, due to a difference of opinion regarding certain aspects of the proposed transactions, the attorney ceased working on them on or about April 23, 2017. Upon information and belief, Richardson was the person who finalized the various agreements.

15. On the same day that Glodek, Richardson and Parks Family executed the Agreement, an Intellectual Property (IP) and Trade Secrets, Data Analysis Sales Agreement ("IP Agreement") was entered into between Advanced BioIP LLC and Parks Family. The IP Agreement was signed by Richardson on behalf of Parks Family and Glodek on behalf of Advanced BioIP. This IP Agreement was represented by Richardson to be the mechanism by which Parks Family transferred all right, title and interest in the Parks Technology to Advanced BioIP as contemplated by Schedule 1 of the Agreement.

16. The IP Agreement provides that Parks Family LLC is "the legal owner of the right, title, interest and goodwill in the registered Trade Secrets, Data Analysis, and common law Trade Secrets, Data Analysis set out in Schedule 1" to the IP Agreement. However, no Schedule 1 was attached to the IP Agreement. Richardson intended to deceive Glodek into believing that the IP

5

Agreement was merely the mechanism by which Advanced BioIP was receiving the Parks Technology contemplated by the Agreement and Schedule 1 thereto.

17. The IP Agreement contained another provision that materially changed the nature of the transaction between Parks Family and Advanced BioIP from what was set forth in the Agreement. The Agreement provided that Parks Family was conveying its entire interest in the listed technology. The IP Agreement, however, provides only that Parks Family granted to Advanced BioIP "a non-exclusive, non-assignable [sic] Advanced BioIP LLC to use the Trade Secrets, Data Analysis."

18. The misrepresentations by Richardson and Parks Family were intended to and in fact did deceive Glodek who relied on the misrepresentations to her detriment.

19. Richardson also represented to Glodek that he would be the product architect of a new monitor and analytical software. He represented that the Parks Technology set forth in Schedule 1 of the Agreement would help IHI develop a cutting edge device with very advanced software. In order to develop the new device and software, Richardson directed Glodek to enter into a Cooperative Development Agreement on behalf of Advanced BioIP with NuLine Sensors, LLC. Glodek had no knowledge of NuLine Sensors prior to discussing it with Richardson. In fact, Richardson stated on several occasions that he wanted to purchase NuLine and that he had sent it a letter of intent to purchase. Relying upon Richardson's representations regarding NuLine, Glodek signed the Cooperative Development Agreement on behalf of Advanced BioIP with an effective date of April 27, 2017.

20. In order to obtain the funding to develop the device and software as set forth in the Cooperative Development Agreement, Glodek entered into two financing agreements with Empire Leasing. Richardson was fully aware of these transactions as well as the fact that Glodek

6

was relying on his representations about his technology when she entered into the Cooperative Development Agreement and the two financing agreements used to fund the development pursuant to the Cooperative Development Agreement. One financing agreement was for a 3 in 1 Holter Event Telemetry device for a total of $341,000. The first payment under this agreement was made on May 3, 2017 and the device was to be delivered in August 2017. No device has been delivered to date. The second financing agreement was for a Holter Patch at a cost of $130,000. The first payment under this agreement was made on August 18, 2017, with a delivery date in the Fall of 2017. No patch has been delivered to date. The financing agreements required Glodek to personally guarantee the loan amounts. The total obligation amounts to $540,309.12, including interest.

21. The first financing agreement provided for Empire to provide one-half of the lease amounts and Glodek was required to front the other $170,500. Empire then wired the other half to NuLine on September 12, 2017. NuLine was to return the $170,500 that Glodek had paid upon receipt of the second half funding from Empire. NuLine knew it was to return the $170,500 to Glodek as soon as Empire wired the second half. However NuLine only returned $100,000 on September 15, 2017 and has refused to return the remaining $70,500 despite numerous phone calls, emails and a letter sent to NuLine's CEO. Thus, the total amount of the loss incurred by Glodek as a result of the NuLine transactions is $610,809.12.

22. In addition, due to the fact that the NuLine devices were never delivered and the acute need for new/updated equipment, Glodek had to then purchase devices from other manufacturers to be able to provide care to patients. As of the end of 2018, Glodek had purchased a total of $225,303 in additional equipment. In June of 2019, Glodek purchased yet an additional

7

$130,000. These purchases were necessitated by the fact that NuLine had failed to deliver on its obligation to provide equipment.

23. The IP Agreement obligated Advanced BioIP to pay Parks Family $20,000 per month in royalty payments for a total of $6,800,000. Advanced BioIP had no bank account. To date, Parks Family has received seven (7) royalty payments of $20,000 for a total of $140,000 from the account of AMI. Richardson has continued to demand payment of the royalties despite the financial difficulties he has created for AMI and despite the fact that Glodek, who was owed the same amount of royalty payments as Richardson, only received $75,000 in such payments.

24. Richardson also directed Glodek to pay, through AMI, a total of $145,746.01 to a consultant that he utilized named Elsa Crouser. Richardson claimed that Crouser was to provide services to AMI. While Crouser ultimately directed one small client to AMI, she failed to provide AMI with services in consideration of the $140,000 paid to her. Richardson was aware of the fact that Crouser did not in reality work for AMI, but directed AMI to make these payments. In fact, Crouser worked with Richardson on multiple projects having nothing to do with AMI. One such project was a joint venture with Dr. Anthony Bacchi of New York involving a company known as AlgoWave Monitoring. Richardson and Crouser worked on this project and others, such as NuGen Link LLC and Cleveland Diabetes Care, with Crouser's compensation being provided by AMI.

## COUNT ONE—FEDERAL DECLARATORY JUDGMENT

25. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 24 as if set forth herein.

26. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 from the Court in which the Court issues a declaration that the Agreement is null and void.

8

Case 2:20-cv-00011-DCLC-CRW   Document 1   Filed 07/18/19   Page 8 of 14   PageID #: 8

27. Defendants Richardson and Parks Family provided no consideration to IHI in exchange for their receipt of IHI stock. As a result, the Agreement is not supported by consideration and the Agreement is null and void. In addition, contrary to the claim by Richardson that the Parks Technology has a value of $6,800,000.00, the Parks Technology is worthless. As a result, the Agreement is not supported by consideration and is null and void.

28. An actual controversy exists between the parties concerning the validity of the Agreement in light of the lack of consideration by Defendants for their stock in IHI.

29. The interests of the parties concerning the validity of the Agreement are real and adverse, and the issue is ripe for adjudication due to the fact that the rights and obligations of the parties under the Agreement are at issue in this Action.

30. The Court should accordingly enter an order declaring that the Agreement is null and void, that the parties are to be returned to their respective positions as they existed prior to the execution of the Agreement, that AMI should be returned to Glodek free and clear of any claims by Richardson or Parks Family, and that the Parks Technology be returned to Parks Family free and clear of any claims by Glodek.

## COUNT TWO—MARYLAND DECLARATORY JUDGMENT

31. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 30 as if set forth herein.

32. Plaintiff seeks a declaratory judgment pursuant to Maryland Code, Courts & Judicial Proceedings Article, §3-401 et seq. from the Court in which the Court issues a declaration that the Agreement is null and void.

33. Defendants Richardson and Parks Family provided no consideration to IHI in exchange for their receipt of IHI stock. As a result, the Agreement is not supported by consideration and

9

the Agreement is null and void. In addition, contrary to the claim by Richardson that the Parks Technology has a value of $6,800,000.00, the Parks Technology is worthless. As a result, the Agreement is not supported by consideration and is null and void.

34. An actual controversy exists between the parties concerning the validity of the Agreement in light of the lack of consideration by Defendants for their stock in IHI.

35. The interests of the parties concerning the validity of the Agreement are real and adverse, and the issue is ripe for adjudication due to the fact that the rights and obligations of the parties under the Agreement are at issue in this Action.

36. The Court should accordingly enter an order declaring that the Agreement is null and void, that the parties are to be returned to their respective positions as they existed prior to the execution of the Agreement, that AMI should be returned to Glodek free and clear of any claims by Richardson or Parks Family, and that the Parks Technology be returned to Parks Family free and clear of any claims by Glodek.

## COUNT THREE—FRAUDULENT INDUCEMENT

37. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 36 as if set forth herein.

38. Richardson and Parks Family made the following representations to Glodek prior to the execution of the Agreement: He owned, through Parks Family, the Parks Technology set forth in Schedule 1 of the Agreement; the Parks Technology was valued at $6,800,000.00; he was assigning all rights to the Parks Technology to IHI through Advanced BioIP LLC in exchange for stock in IHI; the Parks Technology set forth in Schedule 1 of the Agreement was the same technology that was encompassed within the IP Agreement with Advanced BioIP; and that the

10

Case 2:20-cv-00011-DCLC-CRW   Document 1   Filed 07/18/19   Page 10 of 14
PageID #: 10

assignment of the Parks Technology to Advanced BioIP was of all rights to the Parks Technology.

39. The representations set forth in paragraph 36 were false at the time that they were made and Richardson and Parks Family knew that they were false.

40. Richardson and Parks Family made these false representations with the intent to induce Glodek to rely on them and enter into the Agreement.

41. Glodek justifiably relied upon Richardson's and Parks Family's representations to her detriment.

42. As a result, Glodek has been damaged in an amount to be proven at trial, but in no event less than $966,112.12.

## COUNT FOUR—FRAUD

43. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 42 as if set forth herein.

44. Prior to the execution of the Cooperative Development Agreement between Advanced BioIP and NuLine Sensors, LLC, Richardson represented to Glodek that he would be the product architect of a new monitor and analytical software; that the Parks Technology set forth in Schedule 1 of the Agreement would help IHI develop a cutting edge device with very advanced software; and that NuLine Sensors was qualified to manufacture the products that he would design. In order to develop the new device and software, Richardson directed Glodek to enter into a Cooperative Development Agreement on behalf of Advanced BioIP with NuLine Sensors, LLC.

45. These representations were false at the time that they were made and Richardson knew that they were false. Richardson knew that he did not have the technology to develop a cutting

11

edge device with very advanced software. Richardson also knew that NuLine Sensors was not qualified to manufacture the products that he was going to design.

46. These representations were material to the decision of Glodek to enter into the Cooperative Development Agreement as well as the financing agreements with Empire.

47. Richardson made these representations with the intent that Glodek act upon them and enter into the Cooperative Development Agreement and financing agreements.

48. Glodek had no knowledge that the representations made by Richardson were false.

49. Glodek reasonably relied on the representations and entered into the Cooperative Development Agreement and financing agreements.

50. Subsequent to the signing of the Agreement and the Cooperative Development Agreement, Glodek provided whatever funds were required by the business in addition to the cash flow generated by AMI. As the amount advanced by Glodek grew, Glodek sought to have Richardson bear some of the financial burden. Richardson refused to contribute financially to the venture. The need for additional funds led to discussions between Richardson, Glodek, Glodek's daughter, and several banks regarding establishing a line of credit.

51. Discussions about the line of credit focused on Hamilton Bank in Maryland beginning in December 2017. Hamilton Bank required Richardson to provide a financial statement in order to process the line of credit. In connection with these discussions, Richardson provided Glodek's daughter with a personal financial statement that reflected a net worth of $1,077,824,000.00. His assets allegedly included stock in closely held corporations valued at $470,600,000.00, real estate valued at $120,000,000.00 and other assets valued at $482,000,000.00. However, Richardson continued to delay providing Hamilton Bank with the personal financial documents the it required in order to process the requested line of credit. Upon information and belief, this

12

Case 2:20-cv-00011-DCLC-CRW   Document 1   Filed 07/18/19   Page 12 of 14
PageID #: 12

reluctance was due to the fact that Richardson's true financial statement would show that he was worth far less than the amount shown on the financial statement he provided to Glodek and her daughter

52. This financial statement grossly overstated Richardson's net worth. For example, Richardson represented to Glodek that the technology that was set forth in Schedule 1 to the Agreement was valued at $6,800,000.00. In reality, the technology was worthless. Thus, Richardson's representation on his financial statement that AMI was worth $13.6 million was false. Richardson was aware of the fact that Glodek was relying on the accuracy of his valuation of the technology and other assets listed on the financial statement when she continued to fund the operations of AMI.

53. Richardson provided Glodek and her daughter with this fraudulent financial statement in an effort to convince her that he had the financial wherewithal to support AMI's and IntelHeart's business and encourage her to continue to fund AMI.

54. These representations were material to the decision of Glodek to continue funding AMI and doing business with Richardson and Parks Family through IHI.

55. Richardson made these representations with the intent that Glodek act upon them and continue funding AMI.

56. Glodek had no knowledge that the representations made by Richardson were false.

57. Glodek reasonably relied on the representations and continued to fund AMI and do business with Richardson and Parks Family.

58. Glodek was injured as a result of these misrepresentations in an amount to be proven at trial but in no event less than $966,112.12.

13

59. Glodek also reasonably relied on the misrepresentations made by Richardson about the value of the Parks Family technology when she made the royalty payments of $140,000 to Richardson.

60. Glodek had no knowledge that the representations made by Richardson were false.

61. Glodek was injured as a result of these misrepresentations in an amount of $140,000.

62. Glodek reasonably relied on the misrepresentations made by Richardson about the services to be provided to AMI by Crouser.

63. Glodek had no knowledge that the representations made by Richardson regarding Crouser were false.

64. Glodek was injured as a result of these misrepresentations in an amount of $145,746.91

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Respectfully submitted,

/s/ *Larry S. Gondelman*

Larry S. Gondelman
Trial Bar No. 02508
Powers Pyles Sutter & Verville, PC
1501 M Street, NW
Suite 700
Washington, DC 20005
202.466.6550 (phone)
202.785.1756 (facsimile)
larry.gondelman@powerslaw.com